UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

TRANSAMERICA LIFE
INSURANCE COMPANY,

                      Plaintiff,

       v.

ANGELINA D. SLEE, et al.,

                 Defendants.

CASE NO. 2:19-CV-1536-JLR-DWC

REPORT AND RECOMMENDATION

Noting Date: December 28, 2020

## **INTRODUCTION**

       The District Court has referred this action to United States Magistrate Judge David W. Christel. This matter comes before the Court on Plaintiff Transamerica Life Insurance Company's (Transamerica) Motion for Summary Judgment. Dkt. 45. Transamerica seeks declaratory relief on all claims asserted in its First Amended Complaint (Dkt. 18), and the dismissal of all counterclaims brought by the Defendants, Angelina D. and Thomas M. Slee and Anthony Sell, a power of attorney for Angelina D. Slee (the Slees) (Dkt. 39, 40). For the reasons

1  discussed below, the Court recommends Plaintiff's Motion for Summary Judgment be

2  GRANTED.

3  **BACKGROUND**

4        In 1997, the Slees[1] purchased identical policies from Transamerica's predecessor in

5  interest, Bankers United Life Assurance Company, for long-term care insurance. Dkt. 47-1, 2. In

6  2019, the Slees took up residence at two different assisted living facilities (ALFs) in the Seattle

7  area. Angelina Slee moved first, and with the assistance of her son Anthony Slee, who has power

8  of attorney over both Angelina and Thomas Slee, Angelina Slee submitted a claim to

9  Transamerica for costs associated with her new residence at an ALF. Dkt. 47-7. After conducting

10 an investigation, although Transamerica found Angelina Slee to be "medically eligible" to live in

11 a nursing home, on March 14, 2019, Transamerica denied Angelina Slee's claim because she

12 was not, in fact, residing in a nursing home. Dkt. 47-10. The "Benefit Determination Letter"

13 stated, *inter alia*,

14         The coverage you hold with our Company provides Nursing Home
15         Benefits for confinement in a facility which satisfies the policy's
           definition of a Nursing Home. The policy defines a Nursing Home
16         as a facility (or that part of one) which is licensed by the state as a
           nursing home. Additional service level requirements is [sic] that it
17         be engaged in providing nursing care and related services on a
           continuing impatient basis and have a planned program of policies
18         and procedures developed with the advice of, and periodically
           reviewed by, at least one Physician.

19         The license copy we received indicates that Aegis on Madison
20         operates under an Assisted Living Facility license issued by the
           State of Washington's Department of Social and Health Services.
21         Therefore, Aegis on Madison does not satisfy the policy's Nursing
           Home definition based on its licensure.

22

23 ─────────────────

24        [1] For clarity, the Court will refer to Defendants by their first names as necessary.

REPORT AND RECOMMENDATION - 2

1

2

3

4

5

6

7

8

9

10

> We engaged an independent care coordination firm to obtain additional information from Aegis on Madison in an effort to determine if this facility satisfies other elements of the policy's definition of a Nursing Home. In that connection, the facility's representative reported that Aegis on Madison is not a nursing home; is not licensed as a nursing home; is not subject to a nursing home license; is not engaged in providing nursing care and related services on a continuing impatient basis, and does not have a planned program of policies and procedures developed with the advice of, and periodically reviewed by, at least one Physician.
>
> We received a copy of Aegis on Madison's Residence and Care Agreement which was executed in connection with your move into the facility. The Agreement lists the accommodations and services provided by the facility, but there is no indication in the Agreement that Aegis on Madison is licensed as a Nursing Home. In fact, it states: The Community is licensed as an assisted living facility by the Department of Health and Social Services of the State of Washington.

11  Dkt. 47-15.

12          On April 9, 2019, Anthony Slee appealed Transamerica's determination, contending that

13  Angelina Slee's ALF is, in fact, providing "Nursing Home" care to her, and that Transamerica's

14  terminology is "archaic and outmoded." Dkt. 47-17. Anthony Slee also sent the appeal letter to

15  the State of Washington Office of Insurance Commissioner (OIC). *Id*. In response, Transamerica

16  agreed to reevaluate Angelina Slee's claim. Dkt. 47-18**,** 47-20. On May 5, 2019, Transamerica

17  sent Angelina Slee's ALF a request for clarification and additional information. Dkt. 47-19.

18  However, after receiving confirmation that Angelina Slee's ALF was not a licensed nursing

19  home, on August 8, 2019, Transamerica upheld its original benefit determination denying her

20  claim. Dkt. 47-22. The Appeal Determination Letter also explained that Angelina Slee had

21  declined to purchase an optional Home Health and Community Care Rider (HHCC Rider), which

22  included benefits for stays at Assisted Living Facilities (ALFs). *Id*. The letter also reiterated that

23  the ALF at which Angelina Slee resided did not "substantially comply" with the policy's

24

1  definition of a nursing home based on the services it provided. *Id*. Finally, the letter provided a

2  list of more than fifteen eligible facilities in the area that would satisfy the definition of a nursing

3  home under her policy should Angelina Slee choose to move and file a new claim. *Id*.

4         Meanwhile, in July 2019, Thomas Slee reportedly suffered a stroke for which he was

5  hospitalized and then moved to a rehab facility before eventually moving into an ALF on

6  September 9, 2019. Sometime later that month a claim was made for benefits on his

7  Transamerica policy. Dkt. 47-23. As with Angelina Slee's policy, Thomas Slee's policy covers

8  "nursing home" stays, and Thomas Slee did not purchase the HHCC Rider. Dkt. 47-1 at 7, 47-2

9  at 7. Upon investigation, Transamerica determined that while Thomas Slee was likely "medically

10  eligible" to reside in a nursing home, the ALF where he currently resided was not a nursing

11  home licensed by the State of Washington, nor was it operating as a nursing home. Dkt. 47-25,

12  Dkt. 47-26. On November 22, 2019, Transamerica mailed Thomas Slee a Benefits Determination

13  Letter similar to the one provided to Angelina Slee, stating that Thomas Slee's ALF does not

14  meet the policy's "nursing home" definition and therefore benefits are not available to cover the

15  cost of his stay there. Dkt. 47-27. Transamerica also provided Thomas Slee with an extensive list

16  of nearby nursing homes, stating, "Nursing Home Benefits remain available to you under the

17  Policy if you should move to a nursing home in the future." *Id*.

18         On September 13, 2019, the Slees' attorney submitted a complaint to the OIC, stating that

19  Angelina Slee[2] had retained him, and alleging similar claims as the Slees make in the case at bar.

20  Dkt. 47-28.

21

22

23  _____

24  [2] On April 28, 2020, counsel for the Slees lodged a separate complaint with the OIC on behalf of Thomas
Slee, in order to comply with the IFCA notice requirements. Dkt. 47-30.

On September 25, 2019, Transamerica initiated this matter in order to resolve this dispute with the Slees. Dkt. 1. On November 25, 2019, Transamerica filed its First Amended Complaint against the Slees, seeking a declaratory judgment finding it properly denied the Slees' claims. Dkt. 18. After unsuccessfully attempting to dismiss this case, on July 1, 2020, the Slees opposed Transamerica's request, and lodged a number of counterclaims. Dkt. 39-41.

On October 26, 2020, Transamerica filed a Motion for Summary Judgment, seeking both a declaration that it properly denied the Slees' claims, as well as the wholesale dismissal of all of the Slees' counterclaims. Dkt. 45. On November 16, 2020, the Slees responded in opposition to summary judgment. Dkt. 48. On December 3, 2020, the Court heard oral argument on the motion. Finally, on December 8, 2020, the parties each submitted supplemental briefs addressing issues that arose at oral argument. Dkt. 58, 59.

**<u>LEGAL STANDARD</u>**

Summary judgment is proper only if the pleadings, discovery, and disclosure materials on file, and any affidavits, show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"); *see also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute,

1  requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby,*

2  *Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d

3  626, 630 (9th Cir. 1987).

4  <u>**DISCUSSION**</u>

5       As a preliminary matter, the Court notes that the Slees object to numerous statements in

6  transcripts of telephone calls between the Slee family and folks involved in the claims

7  investigation, proffered by Transamerica via sworn declaration of a corporate representative. The

8  Slees argue the declaration and transcripts are inadmissible hearsay, though counsel for the Slees

9  notably relied upon them at oral argument. Dkt. 48 at 22. Conversely, Transamerica argues the

10 declaration by counsel for the Slee's contains inadmissible, unsupported statements, attorney

11 characterization of documents, and conclusory arguments. Dkt. 56 at 9. Both parties ask the

12 Court to strike the objectionable content from the record.

13      Only admissible evidence may be considered in ruling on a motion for summary

14 judgment. *Orr v. Bank of America, NT & SA,* 285 F.3d 764, 773 (9th Cir. 2002); *see also* Fed. R.

15 Civ. P. 56(e). A party may object to cited documentation asserting the material cited would not

16 be admissible in evidence. Fed. R. Civ. P. 56(c)(2). Admissible declarations or affidavits must be

17 based on personal knowledge, must set forth facts that would be admissible in evidence, and

18 must show the declarant or affiant is competent to testify on the matters stated. Fed. R. Civ. P.

19 56(c)(4).

20      The Court finds a detailed ruling on these objections unnecessary because it relies only

21 upon admissible evidence in reaching the findings and recommendations herein.

22

23

24

## I.     The Policy

There is no dispute that the Slees' policy claims are for costs associated with living in ALFs that are not "licensed nursing homes." Transamerica asks the court to determine that on this basis, alone, the Slees fail to show their loss falls within the scope of the policy, because the policy language unambiguously requires the insured to reside in a "licensed nursing home" in order to qualify for benefits. The Slees, on the other hand, argue this Court should find ambiguity in the meaning of "nursing home" and permit a jury to decide if their ALFs "substantially comply" with the policy's description of the services a "nursing home" provides, because if so Transamerica will be required to pay their claims.

Under Washington law, interpretation of an insurance contract is a question of law. *Overton v. Consol. Ins. Co.*, 145 Wash. 2d 417, 424 (2002). Determining whether coverage exists is a two-step process. The insured must first show the loss falls within the scope of the policy's insured losses. *McDonald v. State Farm Fire & Casualty Co.*, 119 Wash. 2d 724, 731 (1992). To avoid coverage, the insurer must then show the loss is excluded by specific policy language. *Id*. When interpreting an insurance policy, "ambiguities are resolved in favor of the policyholder." *Eurick v. Pemco Ins. Co*., 108 Wash. 2d 338, 340 (1987) (citing *E-Z Loader Boat Trailers, Inc. v. Travelers Indem. Co*., 106 Wash. 2d 901, 907 (1986)). "The terms of a policy should be given a fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance." *Overton*, 145 Wash. 2d at 424. Furthermore, a policy must be considered "as a whole," including riders or endorsements. *Kitsap Cty. v. Allstate Ins. Co*., 136 Wash. 2d 567 (1998). Defined terms "should be interpreted in accordance with [the] policy definition." *Id*.

An explanation of the "Nursing Home Benefit" is contained in the main text of the Policy. Dkt. 47-1, 2. It states that, "[a]fter satisfaction of the Nursing Home Elimination Period [of 60 days], We will pay the actual charges for confinement in a Nursing Home, up to the Maximum Daily Nursing Home Benefit shown in the Schedule for each day of a Nursing Home stay." *Id.* According to the Policy, in order to qualify for the Nursing Home Benefit, three conditions must be satisfied:

> (1) Your Physician must certify that Your treatment is Medically Appropriate; and
>
> (2) the care or services must be provided in a Nursing Home; and
>
> (3) the charges must be incurred while this Policy is in force.
>
> Prior approval of a Nursing Home is not required. However, benefits may be paid for confinement in a facility that is not in full compliance with the Nursing Home definition, if Our Personal Care Advisor agrees that the facility substantially complies.

*Id.* Treatment is "Medically Appropriate" if it includes "[c]are and services pursuant to a treatment plan which are:

> (1) Medically Necessary (Medically Necessary means the care and services are necessary and appropriate for the treatment of a Sickness or Injury in accordance with accepted current medical practice); or
>
> (2) required because of Cognitive Impairment; or
>
> (3) required because of [the insured's] inability to perform at least 2 of the 6 Activities of Daily Living…

*Id.*

There appears to be no dispute that Angelina and Thomas Slee both met the above conditions to qualify for the nursing home benefit under their policies. The dispute arises because the Slees did not move into nursing homes—they moved into ALFs, and therefore

1   Transamerica asserts that the Slees failed to show their losses fall within the scope of the policy's

2   insured losses, because ALFs are excluded by specific policy language. That language is found

3   in the policy definition of "Nursing Home," which it defines as:

4       A facility, or that part of a facility which:

5         (1) is licensed by the state as a nursing home; and

6         (2) is engaged in providing, in addition to room and board
    accommodations, nursing care and related services on a
7   continuing inpatient basis; and

8         (3) provides, on a formal prearranged basis, a Nurse who is on duty
    or on call at all times; and
9

10        (4) has a planned program of policies and procedures developed
    with the advice of, and periodically reviewed by, at least one
    Physician; and
11

12        (5) maintains a clinical record of each patient.

13      A Nursing Home may be a distinct part of a hospital or other
    institution. It is not a retirement home or community living center,
    nor is it a place that is primarily used for rest; for the care and
14  treatment of mental diseases or disorders, drug addiction, or
    alcoholism; for day care or for educational care.

15  *Id*.

16

17      Transamerica points to *Howisey v. Transamerica Life Ins. Co.*, 2017 WL 5900356 (W.D.

18  Wash. Nov. 30, 2017), in which Chief Judge Ricardo S. Martinez analyzed a nearly identical set

19  of facts to hold that the policy did not cover the plaintiff's claim for residing at an ALF. The

20  Slees do not dispute that their ALFs do not possess nursing home licenses, however they believe

21  they have shown that their loss falls within the scope of the policy based upon the policy

22  language, cited above, that benefits may be paid even if a facility "is not in full compliance with

23  the Nursing Home definition" so long as Transamerica "agrees that the facility substantially

24  complies." The Slees argue that this case is distinct from *Howisey* because the plaintiff in

*Howisey* did not assert that his ALF "substantially complied" with the policy definition of a "nursing home," whereas the Slees do so assert, and have "presented evidence that disputes Transamerica's characterization of their care facilities." Dkt. 48 at 25.

The problem with the Slees argument is that they do not have any evidence to prove their ALFs "substantially comply" with the policy definition of "Nursing Home." Instead, the Slees rely upon discredited arguments and cases that are not on point. For instance, the Slees argue that Transamerica essentially re-wrote their policies to require "continued skilled nursing care," by using this language in a facility questionnaire sent only to Angelina Slee's ALF. Dkt. 48 at 20. The Slee's argue that the use of this language in the facility questionnaire is tantamount to retroactively changing the policy language, similar to what happened in *Pistorese v. Transamerica Life Insurance Company*, 2013 WL 4008828 (W.D. Wash.), where the Judge Thomas S. Zilly found that Transamerica *did* rewrite the plaintiff's policy by changing the words "nursing care and related services on a continuing inpatient basis" to "*continuing* nursing care and related services on a[n] ~~continuing~~ inpatient basis." *Pistorese*, 2013 WL 4008828, at *4 (emphasis in original). That language is not in the Slees' policies, which Judge Zilly confirms in footnote 7, stating it "only requires a covered facility to operate under 'a license issued by the appropriate licensing agency,' and does not expressly require a facility to be licensed as a nursing home." *Pistorese*, 2013 WL 4008828, at *5.

Instead, Transamerica counters that the discretionary clause the Slees seek to qualify under is similar to the language under scrutiny in *Bancroft v. Minnesota Life Ins. Co*., 329 F. Supp. 3d 1236 (W.D. Wash. 2018), where the court held that an insurer reasonably denied benefits on a life insurance policy that permitted the exercise of discretion in deciding whether it was "satisfied" that the insured's had proven his life expectancy was 24 months or less.

1    Similarly, Transamerica argues it reasonably denied benefits to the Slees when it exercised its

2    discretion in deciding that their ALFs did not "substantially comply" with the policy definition of

3    a nursing home. The Court concurs.

4          In conclusion, this Court finds the policy language unambiguously requires the insured to

5    be in a nursing home licensed by the state in order to be entitled to benefits, that they failed to

6    prove their ALFs met this requirement, and that Transamerica reasonably exercised its discretion

7    in determining the ALFs did not "substantially comply" with the policy definition of "nursing

8    home."

9          **II.    Washington Regulations**

10          The Slees point to the existence of Transamerica's HHCC Rider, which the Slees did not

11    purchase, and a "facility questionnaire" Transamerica sent to Angelina Slee's ALF in the course

12    of investigating her claim,[3] as evidence that Transamerica deliberately seeks to reduce coverage

13    available under the base policy, and to create ambiguity over what type of facility qualifies as a

14    "nursing home." Dkt. 48 at 8, 16. They also contend the requirement that a qualifying facility

15    possess a state-issued nursing home license contravenes Washington law.[4] Dkt. 48 at 22. Finally,

16    the Slees argue that if Transamerica had complied with state requirements in the investigation of

17    their claims it would have determined that they are both essentially receiving "nursing services"

18    at their ALFs. Dkt. 48 at 15.

19

20    _____

21          [3] Notably, according to the Slees, Transamerica did not use this facility questionnaire when it investigated
      Thomas Slee's ALF.

22
          [4] The Slees argue that WAC 284-54-150, which requires long-term care policies to cover "skilled,
23    intermediate, and custodial or personal care, whether benefits are for institutional or community based care,"
      prevents a policy from requiring the care facility to be appropriately licensed. This Court disagrees. This regulation
      does not prevent insurers from requiring facilities to be appropriately licensed, or from offering nursing home
24    benefits and separate assisted living benefits. *Howisey*, 2017 WL 5900356, at *4.

1      This Court has reviewed each of the statutes and regulations cited by the Slees and finds

2  as follows: Washington law does not prevent an insurance policy from requiring a facility to

3  possess a state-issued license as a condition of coverage; the HHCC Rider Transamerica sells—

4  which the Slees did not purchase—does not impose a limitation on the base policy but rather

5  expands coverage to those who purchase it; none of the statutes or regulations cited by the Slees

6  impose specific claim investigation criteria on insurance companies, nor do any of these laws

7  proscribe the use of the "facility questionnaire" Transamerica utilized in the investigation of

8  Angelina Slee's claim. *Howisey*, 2017 WL 5900356, at *4 (W.D. Wash. Nov. 30, 2017)

9  (rejecting insured's arguments regarding Washington statutes and regulations) *reconsideration*

10  *denied,* 2017 WL 6406133, at *2 (W.D. Wash. Dec. 15, 2017) (substantial compliance provision

11  did not provide coverage and "no regulation cited by [the insured] prevents insurers from

12  requiring facilities to be appropriately licensed, or from offering nursing home benefits and

13  separate assisted living benefits"); *aff'd*, 765 F. App'x 219 (9th Cir. 2019) (affirming summary

14  judgment in Transamerica's favor, holding Transamerica's policy language did not violate

15  Washington statutes or regulations, and substantial compliance provision did not provide

16  coverage).

17      **III.    Request for Certification**

18      The Slees ask this Court to certify to the Washington Supreme Court the question of

19  whether Washington law permits insurers to limit long-term care coverage to a facility licensed

20  as a nursing home under a policy definition. When in the opinion of any federal court before

21  whom a proceeding is pending, it is necessary to ascertain the local law of this state in order to

22  dispose of such proceeding and the local law has not been clearly determined, such federal court

23

24

1    may certify to the supreme court for answer the question of local law involved and the supreme

2    court shall render its opinion in answer thereto." RCWA 2.60.020.

3         This Court, having found Washington law *does* permit insurers to limit long-term care

4    coverage to a facility licensed as a nursing home under a policy definition, declines the Slees'

5    request to certify the question to the Washington Supreme Court.

6    **IV.    The Slees' Counterclaims**

7         The Slees bring ten counterclaims. First, the Slees seek a declaration that Transamerica

8    must pay their claims. For the reasons discussed above, this claim fails as a matter of law.

9         Second and third, the Slees claim Transamerica breached the contract with the Slees "by

10   refusing to pay long-term care benefits for "institutional" care," and thereby also breached the

11   implied covenant of good faith and fair dealing. Having already analyzed the contract, above, the

12   Court will not revisit it here. Nevertheless, even where a breach of contract is not found, and

13   coverage is properly denied, an insured may have a cause of action under the CPA for breach of

14   the implied covenant of good faith and fair dealing if the insurer failed to conduct an adequate

15   investigation of the claim. *Coventry Associates v. American States Insurance Co*., 136 Wash. 2d

16   269, 279 (1998). To establish a *Coventry* claim the insured must prove that the insurer failed to

17   adequately investigate the insured's claim in good faith, and that the insured suffered harm

18   proximately caused by the deficient investigation. *Id*. at 937-38 (insurer is not required to "pay

19   claims which are not covered by the contract or take other actions inconsistent with the contract,"

20   mere mistakes in the investigation are not actionable, and insured must establish actual harm);

21   *see also Howisey*, 765 F. App'x at 222 (insured could not establish bad faith claim where he

22   "failed to show that a different investigation by Transamerica would have led to a different

23   Nursing Home Benefit claim determination").

24

1    The Slees have not pointed the Court to any evidence upon which it could conclude that

2    Transamerica failed to conduct good faith investigations of their claims, or that it would not have

3    denied them if it had conducted the investigations differently. Instead, the record in both claim

4    investigations shows that the lack of a state-issued nursing home license was principal reason for

5    denying the claims, and that the ALFs did not otherwise "substantially comply" with the policy

6    definition of what a nursing home is. It also bears noting that Transamerica told the Slees if they

7    move to licensed nursing homes in the future, they can still take advantage of their policies.

8    Therefore, this Court concludes that no reasonable juror could find Transamerica acted in bad

9    faith. Consequently, claims two and three fail and are dismissed.

10    Fourth and fifth, the Slees claim Transamerica committed both intentional and negligent

11    misrepresentation in the sale of the policy by informing them "that an insured could qualify for

12    benefits in three separate ways…then mak[ing] qualification for coverage conditioned on

13    meeting all three qualification requirements." Dkt. 39, ¶ 95, 110. Furthermore, they claim

14    "[Transamerica's predecessor in interest] failed to disclose to [them] that institutional care under

15    the policy must be provided in a facility that is licensed as a 'nursing home." *Id*. at ¶ 98, 99.

16    "Nine elements comprise a fraud claim under Washington law: (1) representation of an

17    existing fact; (2) materiality; (3) falsity; (4) the speaker's knowledge of its falsity; (5) intent of

18    the speaker that it should be acted upon by the plaintiff; (6) plaintiff's ignorance of its falsity; (7)

19    plaintiff's reliance on the truth of the representation; (8) plaintiff's right to rely upon it; and (9)

20    damages suffered by the plaintiff." *Westcott v. Wells Fargo Bank, N.A*., 862 F. Supp. 2d 1111,

21    1117 (W.D. Wash. 2012). The Washington standard for negligent misrepresentation is:

22                One who, in the course of his business, profession or employment,
             or in any other transaction in which he has a pecuniary interest,
23                supplies false information for the guidance of others in their

24

REPORT AND RECOMMENDATION - 14

> business transactions, is subject to liability for pecuniary loss caused
> to them by their justifiable reliance on the information, if he fails to
> exercise reasonable care or competence in obtaining or
> communicating the information.

*Richardson v. Wells Fargo Ins. Servs. USA, Inc*., 2017 WL 3172812, at *5 (W.D. Wash. July 26, 2017).

The Slees have not presented any admissible evidence that Transamerica intentionally and negligently supplied them with false information. The sales materials supplied to the Slees at the point of sale do not contain any information inconsistent with the actual policies. Dkt. 47-6. Their applications include a box asking if the applicant wished to purchase the HHCC Rider to the base policy, and both Angelina and Thomas Slees applications indicate "no." Dkt. 47-3 at 3, 47-4 at 3. Finally, the policies were sent to the Slees, and the cover page advised them to read the entire policy. Under the heading "30-DAY RIGHT TO RETURN" the cover page reads:

> If you are not satisfied for any reason, you may return this policy to
> us or your agent within 30 days after receipt. We will then return
> your money. That will mean this policy was never in force. An
> additional ten percent will be added to any premium refund that is
> not paid within 30 days of return of the Policy to Us or the agent.

Dkt. 47-1, 2. If the Slees had followed this directive, which they had a legal duty to do, they would have plainly seen the language requiring the long-term care facility covered under the policy to be a state-licensed nursing home. In other words, the Slees have not proven any element of claims four and five. Accordingly, they fail as a matter of law.

Sixth, the Slees claim Transamerica's predecessor in interest baited her into purchasing a policy for "institutional" coverage, then switched her coverage to a policy that requires care in a licensed nursing home. Dkt. 39 at ¶ 117. Again, the sales materials are useful in establishing that the Slees were offered the base "nursing home" benefit as well as optional riders to cover additional services, such as the HHCC Rider. Dkt. 47-6. The sales materials also list the three

1    circumstances that would qualify an insured to enter long-term care, including "medical

2    necessity," "cognitive impairment," or, "the inability to perform at least two activities of daily

3    living," which are listed as "dressing," "eating," "toileting," "bathing," "transferring from bend,

4    chair or wheelchair," and "maintaining continence." Dkt. 47-1 at 9, 47-6 at 6. As discussed

5    above, the policy says the same thing. In sum, nothing in the sales materials indicates a material

6    inconsistency with the policy the Slees purchased. Therefore, this claim, too, fails as a matter of

7    law.

8        Seventh, the Slees claim Transamerica hired an entity called "CareScout" to evaluate the

9    ALF where Angelina Slee resided to determine if it met the policy requirements. According to

10   Angelina Slee, CareScout was not actually an independent entity insofar as Transamerica

11   instructed Carescout on ways to deny coverage. There is no evidence in the record supporting

12   any part of this claim. Therefore, this claim fails as a matter of law.

13       Eighth, the Slees claim Transamerica's denial of coverage violates the Insurance Fair

14   Conduct Act (IFCA) and its administrative rules, because "denial of coverage on a license level

15   of the facility is not a permissible exclusion to coverage" under these laws. Dkt. 39 at ¶ 130.3.

16   Under IFCA, "an insured 'who is unreasonably denied a claim for coverage or payment of

17   benefits by an insurer' may sue to recover actual damages and costs.'" *Kabrich v. Allstate Prop.*

18   *& Cas. Ins. Co*., 693 F. App'x 524, 526 (9th Cir. 2017) (citing RCW 48.30.015(1) and *Perez-*

19   *Crisantos v. State Farm Fire & Cas. Co*., 187 Wash. 2d 669 (2017)). In addition, after finding

20   that an insurer has "acted unreasonably in denying a claim for coverage or payment of

21   benefits," or violated one of the Washington Administrative Code (WAC) sections listed in

22   RCW 48.30.015(5), a court may increase the total damages award to an amount not to exceed

23   three times the actual damages and award, reasonable attorney's fees, and actual and statutory

24

REPORT AND RECOMMENDATION - 16

1  litigation costs. RCW 48.30.015(2), (3). However, IFCA does not create an independent cause of

2  action for regulatory violations in the absence of any unreasonable denial of coverage or

3  benefits. *Perez-Crisantos*, 187 Wash. 2d at 683-84. Since this Court finds Transamerica did not

4  unreasonably deny coverage to the Slees, their IFCA claim cannot survive, and is therefore

5  dismissed as a matter of law.

6      Ninth, the Slees claim Transamerica violated the Consumer Protection Act (CPA), which

7  they claim prohibits an insurance policy from requiring an insured to reside in a licensed nursing

8  home in order to claim benefits. Dkt. 39 at ¶ 134. The CPA prohibits ''[u]nfair methods of

9  competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.''

10 RCW 19.86.020. To establish a claim under the CPA, the Slees must prove: (1) an unfair or

11 deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4)

12 injury to his business or property; and (5) causation. *Schreib v. Am. Family Mut. Ins. Co*., 129 F.

13 Supp. 3d 1129, 1135 (W.D. Wash. 2015). Where a claim under the CPA is predicated on the

14 denial of an insurance claim, the insured has a heavy burden to prove that the insurer's conduct

15 was ''unreasonable, frivolous, or unfounded.'' *Overton v. Consol. Ins. Co*., 145 Wash. 2d 417

16 (2002). As previously explained, the Court finds that the Slees have failed to present necessary

17 facts to support that Transamerica acted unreasonably. Accordingly, this claim also fails as a

18 matter of law.

19     Finally, the Slees claim that Transamerica acted in bad faith because Washington law

20 prohibits "denial of coverage of the base policy benefit for institutional care on the basis of a

21 facility license." Dkt. 39 at ¶140. In order to establish bad faith, an insured is required to show

22 claim denial was unreasonable, frivolous, or unfounded. *St. Paul Fire & Marine Ins. Co. v.*

23 *Onvia, Inc*., 165 Wash. 2d 122, 196 (2008) (*citing Mutual of Enumclaw Ins. Co. v. Dan Paulson*

24

1 | *Constr., Inc.*, 161 Wash. 2d 903 (2007)). Having conclusively determined that Transamerica had

2 | a reasonable basis for denying the claims in this case, the Slees cannot make a prima facie case

3 | for bad faith. Accordingly, this claim is also dismissed.

4 | **CONCLUSION**

5 | The Court recommends Plaintiff's Motion for Summary Judgment be GRANTED. Pursuant

6 | to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen

7 | (14) days from service of this Report to file written objections. *See also* FED. R. CIV. P. 6. Failure to

8 | file objections will result in a waiver of those objections for purposes of *de novo* review by the

9 | district judge. *See* 28 U.S.C. § 636(b)(1)(C). Accommodating the time limit imposed by Federal Rule

10 | of Civil Procedure 72(b), the clerk is directed to set the matter for consideration on December 28,

11 | 2020, as noted in the caption.

12 | Dated this 11th day of December, 2020

13 |

14 | David W. Christel
United States Magistrate Judge